In re Estate of Nakuapa, deceased.

## SUPREME COURT—IN BANCO.

### JANUARY TERM—1872.

*Allen, Ch. J., Widemann, J., (Hartwell, J., dissenting.)*

---

### IN RE ESTATE OF NAKUAPA, DECEASED.

A CHILD adopted as an heir by ancient custom inherits to the exclu-
sion of collateral kindred, although the adopters died since the
present statutes of Wills and Descent took effect. But this relation
must be shown by clear and unambiguous evidence, and no judg-
ment is sustainable merely on a verdict that the claimant is a
KEIKI HANAI, or foster-child.

ALLEN, C. J.: A petition for Letters of Administration of
the estate of Nakuapa was presented to the Chief Justice,
sitting in Probate, by Keahi, who claimed to be a cousin of
the decedent. At the hearing various claimants appeared,
and among them Kaaoaopa, who claimed the estate and the
right to administer upon it, as an adopted daughter of
Nakuapa, alleging that the adoption was made before any
law requiring adoptions to be made in writing. The Chief
Justice, sitting in Probate, having heard the testimony
offered, decided that Kaaoaopa was not an adopted child of
decedent, from which decision an appeal was taken on that
issue of fact to a jury, who gave a verdict that Kaaoaopa was
a *keiki hanai* of Nakuapa. A judgment on this verdict is
resisted on the ground that a person adopted by verbal
agreement prior to the enactment of written laws requiring
that the adoption should be in writing, could not inherit by
force of this relationship alone.

Before written laws are passed by the legitimate author-
ities of a nation, the customs and usages which have long
prevailed, and have been universally recognized, have the

In re Estate of Nakuapa, deceased.

same force of law as those subsequently passed and incorporated in a Code. The evidence, however, must be clear and complete in regard to the custom and usage.

It is unnecessary to give a detail of evidence in relation to the custom and usage which prevailed in relation to adoption, prior to the written law, for it is admitted that it was a very general custom among the people. Under the general term of adopted children, there were various relations to the adopted. Some were mere foster children, taken to nurse and to exercise a parental care over, and for a temporary purpose; others were adopted as one's own children to be cared for, to live with the adopter as such; and it is necessary that the relation should be clearly defined by competent evidence in relation to the precise terms of the original contract.

It is contended by the counsel for the contestant "that as no statute can be found which recognizes the relationship of an adopted child as an inheriting relation, we must conclude that no such incident attached to it before the first enactment on the subject." This objection has great force. But we account for this omission of special reference to an adopted child, in terms, to the fact that when one was adopted in that relation, he was so regarded as a child in the family, and entitled to all the rights of a child of the blood, and hence the general term was used. Our statute of inheritance declares that property shall be divided equally between the intestate's children. We regard an adopted child as included in this general term. We mean a child who is adopted as one's own child, with the clear understanding that he is entitled to heirship. The Court is fully aware that children often lived under the charge of those acting in the relation of parents, so far as food and clothing were concerned, who were not entitled to inheritance. And hence the great difficulty of adjudicating in this class of cases, after the lapse of so many years, and Courts and Juries should require the

most satisfactory evidence that the adoption was made in reference to heirship as well as to general care and supervision. So far as the Court have referred in their decisions to the general question of adoption, it has been taken as an admitted principle that children adopted with the foregoing provisions had the right of inheritance under the written law of descent now in force. In June, 1856, a claim was made to a portion of the estate of Puaa by Ikuwa, an adopted child of Kaimihau, the wife of Puaa. The evidence in that case is as follows:

"The adoption was in the presence of Naihe, who was the tax collector of the district. I am a resident of Kohala. He lived with Kaimihau for some time, and then went to the seminary at Hilo for a number of years. The father of Ikuwa was brother to Kaimihau. The tax officer did not give us any certificate; he merely put the names in his book. The Court ordered that one half the property of Puaa's estate should be given to Ikuwa."

Another case, in the matter of Hakau—1 Haw. Rep. was presented to the Court in the same year, in which one Manoa claimed an interest in the estate as an adopted child, and the Court say "that Manoa was not related, even in the most remote degree to Hakau, but was merely connected in some way with her first husband, Kahananui, Sen. Nor do we think, although Manoa lived in the family of Hakau for a great length of time, there is satisfactory evidence to show that she had formally adopted him as her child, or any evidence whatever that she intended him to share in her property, with her nephews and nieces. Had Manoa been adopted by Hakau as her son, in due form of law, he would have been sole heir to her estate, upon her dying intestate." This opinion was drawn by Mr. Justice Robertson, and concurred in by Chief Justice Lee.

In the case of Abenela vs. Kailikole, 2 Haw. Rep., 660, Mr. Justice Robertson says that "all agreements of adoption are

of great importance, as affecting the rights of property," and in the case of the estate of Kamehameha IV., the same Justice says that "He was entitled, as the adopted son of Kamehameha III., to inherit the remainder of his estate, not demised to any one else, subject to dower."

The opinions of Chief Justice Lee and Mr. Justice Robertson are worthy of very great consideration on all questions where the customs and usages of the Hawaiian people are concerned. They were familiar with the people, and their experience on the Land Commission, and their examinations of cases touching native rights, enabled them to form very correct opinions on all questions involving Hawaiian usages and customs.

This question must be decided upon our own usages and customs, and written laws, and none other.

The adoption of children has not been recognized until recently in countries where the common law prevailed. In Massachusetts, a child by adoption has the same rights of inheritance as a child who had been born to parents in lawful wedlock, except he cannot inherit property expressly limited to the heirs of the body, or bodies of the parents by adoption; and in examining the law of descent in the same State, as contained in the revised statutes, no reference is made to adopted children. In this respect, it is an omission analogous to our own Code, and strongly confirms the construction the Court has given to it.

"By the ancient civil law, adoption created the relation of father and son, for all practical purposes, just as if the adopted son were born of the blood of the adopted father in lawful marriage. The adopted child quitted entirely his own family, and entered the family of his adopter, passing under the paternal power of his new family, and acquiring the capacity to inherit through him." Roman Law, by Lord Mackenzie, 122.

Adoption was very common in Rome, and was considered

a very useful institution. In France the usage was lost after the first race of Kings, but was re-established in 1792, and is now sanctioned by the Civil Code. There are many restrictions in the French Code in effecting this relationship; but in regard to the property of the adopter himself, the adopted person has precisely the same rights as a child born in marriage, although there are other children born in marriage after his adoption. He retains all his rights as a member of his natural family, but acquiring no right of succession to the property of any relation of the adopter.

The practice of adoption still prevails among the nations of the East.

It is contended that numerous instances can be cited where children of high chiefs were adopted, and they did not inherit property by virtue of this relationship. It is not made apparent to the Court why they did not inherit, but doubtless for the reason that they were not adopted as children with the rights of heirship. In this country, the adoptions were of such a various relationship, some as temporary, and others as permanent, that a Court and Jury must be satisfied that the adoption caused the relationship of a child of the blood, so far as kind treatment, support, and right of inheritance were concerned.

It is further contended that if an adopted child inherits, to the exclusion of the collateral blood, the position of such a person would be better than that of the children of the blood of the adopting parents, as the child adopted might inherit from two lots of property under the civil law, when the principle of adoption was very generally recognized. This was never regarded as objectionable, and why should it be? It is a contract made by the natural parents and adopting parents for the highest good of the child. But it must be remembered that the adopting parent does not preclude himself from disposing of his property by will as he pleases. The child adopted, when entitled to heirship, can of course

In re Estate of Nakuapa, deceased.

have no greater rights than the child of the blood who is an heir, but his inheritance may be defeated by the will of his parent.

The Court is of opinion that there were children by adoption who were regarded in all respects as one's own children, and that in the enactment of laws, the same terms were applied *to them* as to the children of the blood, that is, they were regarded as the intestate's children.

The majority of the Court are of · opinion that there was, prior to the written law, a custom and ·usage which recognized an adoption, if clearly defined in the contract, by by which the child adopted might be an heir to the property of the adopter.

The principle of adoption was cherished by the Hawaiians. By their first written laws, there was a provision that the act of adoption must be done in writing and before an officer to witness the transaction, otherwise "the child could not be transferred." And by the same law it was provided that when the parent dies, the child is the heir, if there be any child living. And it is very evident that the word child, applied to the adopted child, as well to a child of the blood. The law makers of that day wisely provided that the contract of adoption should be in writing, that the rights of the parties should be clearly understood. It is very clear that when the child was transferred, it became the child in law of the adopting parent; and to this class the law of inheritance applied.

The law of 1846 provides how adoptions may be legalized, and so do the laws now in *force*.

As adoption was recognized by the ancient customs and has continued to be by the laws of the Kingdom, it is evident that it was a relationship endeared to the people, and regarded by them of the highest importance. Is it reasonable to suppose then, that it imparted no rights—that it was the relationship of a day, and for a comparatively unim-

In re Estate of Nakuapa, deceased.

portant purpose ?   To the Hawaiian, it was a sacred relation, and having all the rights, duties and obligations of a child of the blood; and the opinion which the majority of the Court entertain is, that by ancient custom and usage an adopted child was an heir of his adopted parents, when so stipulated, and that the same view of these rights of the adopted child was entertained by the different Legislative bodies of the Kingdom, although the specific term is not used in the law of descents.

But the evidence as to the right of the *keiki hanai* to inherit, is somewhat conflicting, and the Court are uncertain what the intention of the jury was in rendering the verdict, by the terms used, and therefore they regard it as an act of justice to the parties, that a new trial should be granted. The verdict is not clearly responsive to the issue, and it is the judgment of the Court that the verdict of the jury be set aside and a new trial granted.

WIDEMANN, J.: Kaaoaopa in this matter obtained the verdict of a jury that she was a *keiki hanai* of the deceased, and as such *keiki hanai*, claims the estate. The adoption in this case was made long before there were any written laws in the country.

The adoption of a child as heir, clearly and definitely made according to Hawaiian custom and usages prior to the written law, I hold to be valid under existing laws, and I therefore concur in the decision of the Chief Justice, that as far as the verdict of the jury is clearly not responsive to this issue, a new trial should be granted.

HARTWELL, J.: The decree from which this appeal was taken was a decree *in rem*, awarding to the adopted child the estate of her adopter. No public notice was given of the motion for this decree, and it is therefore wanting in this legal requirement of a final adjudication of property, which, in order to its validity, should be good as against all claimants.

In re Estate of Nakuapa, deceased.

The decree was made at Chambers while the cause itself was pending at *nisi prius*, the motion in arrest of judgment still remaining undisposed of in that Court. The verdict that the appellee was a *keiki hanai* or foster child of the decedent, gives no basis for a judgment or decree, for this relation of itself alone has never, as I understand, been regarded as sufficient to make such child an heir.

The Act of 1864, under which probate appeals are triable by jury, restricts such trials to issues of fact in claims under a will or under the statute of descents. An issue of the adoption of an heir by ancient custom is not triable by jury therefore, unless it be classed as a claim under a will,—and no such claim is now presented,—or under the statute of descents, on the ground that this statute may be construed to include adopted heirs with issue of the body, as heirs at law. The construction, as it seems to me, is legally impossible. For these reasons I think the decree cannot stand.

Nor do I think that a new trial in any form should be granted, for inasmuch as this decedent died since the present statutes of wills, descent and transfer of property took effect, I do not regard her act, in adopting the appellee as an heir, as one which the law can now sanction and effectuate.

In this view I have the misfortune to dissent from the majority of the Court, and I therefore present it with extreme deference.

The adoption of an heir is the appointment of a successor. Viewed as a contract, it is an agreement whereby the adopters agree with the parents to take the child to treat as their own in all respects ; including nurture and education, and with the further understanding that if they do not otherwise dispose of their property by will, the child at their death shall inherit it. It is a well known fact that agreements of this kind were once common among the natives of this kingdom, and were carried into effect unless the chiefs saw reason to order some other disposition of the property. But they

change no natural law. The adopted heir remained akin to his natural parents and not to his adoptive parents. That they can now have the effect of modifying the statute of descent by making any others the heirs at law than are therein specified, is not a view which is presented for consideration. For this would be nothing less than setting aside the statute at the option of private parties. If private contracts could render inoperative the statutes of wills and descent, legislation on those subjects might well cease.

But it is not admitted that the adoption of an heir is a testamentary act, and therefore in contravention of the statute of wills. I respectfully submit that in so far as such adoption is now held by the Court to have the effect of putting the adopted heir in the place of the successor to the adopter's estate, it is in its nature and effect a testamentary act, coming under the requirements of law concerning testamentary acts, and thereby invalid. It seems to me that the case might be rested on this view alone, since the law concerning the requisites of a last will may at any time be changed, and the law as it stands at the testator's death must govern.

The argument in favor of the present legality of an adoption of an heir is based on a construction applied to the statute of descent, by construing the word "child" to mean "an heir adopted according to ancient usage." This view is consistent in disavowing the idea that mere agreements can render statutes inoperative. It is also consistent with the fact that an adoptive agreement permitted the adoptive heir to be disinherited, just as a will is revocable by a testator. This fact leads to the inference that no vested rights were acquired by the adoption, for otherwise they could not be annulled either by the adopter or by act of the Legislature. If this inference be correct, a change in the law of descent works no wrong, for no vested right is thereby destroyed. This is the view elsewhere taken by courts of law,

In re Estate of Nakuapa, deceased.

concerning the rights of persons claiming under a will or as heirs at law, viz.: *that those rights are fixed and vested only at the death of the testator or intestate, and are defined by the law as it then stands.* The law to-day may be changed here so as to give the eldest son a double portion, and no one could be heard to complain that his vested rights were thereby impaired.

It is argued that the statute of descent does not change the previously existing customary law, or to attempt to state the position more accurately, that it was not intended that the word "child" there used should exclude heirs adopted by ancient usage.

It does not seem to me that this question of construction of the statute is open for consideration, for construction of clear, plain, unambiguous language in a statute is only admissible, I think, when other statutes conflict, and it is sought to give effect to both, or when the results of reading the words in their plain and natural meaning would be so strange and oppressive that the Legislature may fairly be presumed not to have meant what they appear to have said.

Now it is only on the ground that the Legislature, in using the words they have used, "child," "kindred," "issue," "lineal descendants," &c., did not thereby intend to repeal the ancient customary law concerning adopted heirs, and that the statute and the customary law are to be construed in such manner as to give effect to both, that this question of construction is open. But the Civil Code enacts the principle of law concerning the repeal of statutes, that "the repeal of a law is implied when the new law contains provisions contrary to or irreconcilable with those of the former law," —Section 21. I submit that the ancient Hawaiian modes of transmitting property by devise, by will of the chief or by the adoption of heirs, are inconsistent with the present Hawaiian statute of descents ; that the language of this statute is clear, leaving no room for inference, construction or inter-

pretation; and that by construing that language to mean that which it once meant in the native mind, and not what it now means in its ordinary English sense, it will be found that the rights both of the kindred, of the adopters and of the natural parents, cannot legally be ascertained.

The capacity to inherit is a *civil status*, fixed by municipal law applied to natural laws of sex and offspring, to the relations arising therefrom, and to the artificial relations created by the appointment of heirs, whether by will or adoption. History shows that the capacity to inherit has never been treated as an inalienable, natural right, but that it has been determined by the necessities and usages of the nation or race. The eldest male of the clan, the eldest son of the married pair, or all the children equally, have been allowed to inherit, according to the desire to keep military ascendancy, induce accumulation of estates, perpetuate great families, or promote a nearer approach to equality. Heirs are more often adopted in eastern countries where plurality of wives is allowed, where a laxity in the marriage tie exists, or where the property in the absence of offspring or adopted heirs escheats to the state; although the civil law also makes full and minute provisions for this relation, and it is recently provided for by statute in Massachusetts and New York.

The law of inheritance is thus varied in different countries, and is variable in the same country. When the customs, needs and wishes of a people change, their laws of inheritance are likely to change also. It is generally true that the manners and customs of a people as of an individual express their character and established convictions, and are incorporated expressly or by necessary implication in their positive law. Customary law may be as positive and imperative as statutory law, and each rests on the sanction, express or implied, of the law-making power. The English common law is largely made up of unenacted customary law,—the ancient rights and customs which kings of England so often

In re Estate of Nakuapa, deceased.

were called on to declare that they would observe. But statutory law is last in point of time, and its enactments cannot be annulled by a disused 'custom. The English statute of descent expressly reserves certain ancient customary modes of descent. English statutes expressly permit Mohamedan, Hindoo and Gentoo law to be retained in India with English law. But for this statutory reservation, it is hard to see how the statutes could have been set aside by distinct customs and laws of an opposite nature.

On the subject of descent, it does not seem to me that the. statutes of this kingdom affect to re-enact or recognize the ancient Hawaiian modes of transmitting or devising property. Rights of adoption as well as rights of primogeniture are mentioned in the resolutions adopted by the Legislature in 1846, as the guide to the Land Commission in settling titles ; but the same resolutions define and limit such rights to "those which shall be established in the Civil Code," thereafter enacted. That the Civil Code fails to provide for the descent of property either by primogeniture or to heirs appointed under the ancient method, is to my mind evidence that the law-makers felt that it was not desirable or else not feasible to make just and adequate provisions for the complicated relations arising under the old system. The ancient modes of transmitting to adopted heirs were fitted for a different form of government, different relations in domestic life and different tenure of property than now exist or are legitimate. Those modes, I think, were too capricious and uncertain to be termed law as the 'word is now understood, or to meet the wants of an enlightened and acquisitive community, or to accord with the present standard of morality. There is a deep moral significance in the laws which a nation enacts, and particularly in laws regulating the mode of holding, transferring and transmitting property. The present theory of inheritance seems to be based on the idea of a marriage according to the forms of a Christian community. Hence
45

have arisen new duties, obligations and rights under the relations as now understood of husband, wife, parent, child and the lineal and collateral ties resulting. Native customs and ideas concerning the adoption of parents or of children, the transfer of land by word of mouth, and many other subjects on which legislation from abroad has been introduced, are undoubtedly as dear and sacred to their minds as are the new forms of law. This country presents a remarkable instance of a change in the laws antedating a change in the general usages and convictions of the race. The Hawaiian native leaders, trusting the good sense and wisdom of their foreign friends domesticated here, foreseeing the advantages of a certain, definite and codified system of law and the necessity of applying to the changed circumstances of the nation a theory of law which should foster the accumulation of property and induce foreign powers to recognize a country ruled in a secure and consistent manner, caused the enactment of a code of laws which in many respects were radically at variance with former national customs, and in advance of the usages of the people at large.

Now the statute is clear which prescribes the descent of property of persons dying intestate : *first*, to lineal descendants and widow ; *second*, to collateral kindred and widow, and to the husband in the absence of wife's kindred ; *finally*, in the absence of such heirs, to the Hawaiian Government, or owner of the ahupuaa by escheat. The legislators are themselves the best expositors of the language they use, and they have declared that the word "issue" shall mean "lawful lineal descendants."—Civil Code, Section 1448. The statute declares that in the absence of *issue*, collateral kindred and widow *shall* inherit. An adopted child is neither issue, lineal descendant nor kindred, and I see no room for the Court to say that the Legislature intended in the words cited to include the words "adopted heirs."

I am compelled to deny the power of this Court to read

In re Estate of Nakuapa, deceased.

this statute according to native ideas and usages which prevailed before the establishment of the present system of government, and which are inconsistent with the simple, unambiguous and consistent meaning of the entire wording of the statute.

Finally, if these statutory words are construed to have the meaning attached to them by ancient native custom, then the Legislature have failed to provide for the descent of the property of the kindred of the adopted heir and of his adoptive family. If he inherit from both families, then at his death this two-fold inheritance descends to his kindred, in which case his adoptive family are wronged; or it descends in the adoptive family, in which case his kindred lose their inheritance.

As to precedents of this Court, I fully recognize their binding authority when they are final decisions on points submitted for adjudication, and not an expression on hypothetical cases not before the Court, nor rulings of a single Justice at Chambers or *nisi prius*. There are, I believe, no such precedents to govern this case.

I repeat my remark on this point made in the Maughan case : "In the case of the estate of His late Majesty Kamehameha IV, the Court *in banco* say that Liholiho would have been 'entitled as the adopted son to inherit,' even if he had not taken under a will. But this also is a mere *obiter dictum*, and is hardly reconcilable with the actual decision explained by their subsequent remark that the descent of the rest of the property (not reserved to the Crown) 'must be governed by the general law of inheritance and distribution, and Her Majesty Queen Emma is *therefore* entitled as *statutory heir* to one-half.' This last point *was* decided, and the decision I regard as binding and conclusive in the present case as against any but statutory heirs."

On the fact that the appellant is cousin of the blood of the intestate and her next of kin rests the statute which makes

her the heir at law of the intestate, and I cannot say that she is not the heir at law.

W. C. Jones for appellant.

A. F. Judd and S. B. Dole for appellee.