RAY J. O'BRIEN AND HAWAIIAN TRUST COMPANY, LIMITED, ET AL., *v.* THOMAS WALKER, ET AL.

No. 2377.

Argued February 14 and 16 and Submitted February 17, 1939.        Decided August 11, 1939.

Coke, C. J., Circuit Judge Brooks in Place of Peters, J., Absent, and Circuit Judge Le Baron in Place of Kemp, J., Disqualified.

OPINION OF THE COURT BY CIRCUIT JUDGE LE BARON.
(Coke, C. J., dissenting in part.)

This case comes to this court upon appeal from the decision and decree of the circuit judge of the first judicial circuit sitting at chambers in equity upon a bill filed by a trustee for instructions with respect to the final distribution of assets of the trust estate, for construction of the deed of trust and for approval of the trustee's account.

In 1896 a deed of trust was executed by John A. Cummins and his wife who, it is undisputed, were of part-Hawaiian and Hawaiian blood, respectively, born and raised and residing all of their lives in Hawaii; the deed recites that the trustor "is desirous of making a permanent

and irrevocable settlement upon his wife * * * and their children, towit: Thomas B. Cummins, Matilda K. Walker, Jane P. Merseberg and May I. Creighton, all residing in said Honolulu." Then follows the conveyance of property to the trustee, upon trust, to collect the rents, etc., and manage the trust estate, with power to sell upon the request of the trustor and his wife, and after their deaths at the trustee's discretion. Out of the income of the trust the trustee was to pay to the wife during the term of her natural life $150 per month as a preferred and first charge upon the net income of the trust estate, the balance of the net income to be paid in quarterly installments to the trustor during his lifetime; after the death of the wife the whole of the income to the trustor during his life; after his death, it was provided that "the said net income shall be paid, share and share alike, to the children aforesaid of the parties of the first and second parts, who shall survive the party of the first part, and such child or children of any of them, the children of the parties of the first and second parts, who may die before the party of the first part, except that the children of any of them, the said children of the parties of the first and second parts, who may die before the party of the first part, shall take between them the share only which their parent would have taken if he or she had survived the party of the first part, the net income, after the death of the party of the first part, shall be subject only to the allowance hereinabove made to the party of the second part, if she shall survive the party of the first part, and subject to a further charge of Twenty-five (25) Dollars per month to be paid to Charles Mahoe, for and during the term of his natural life, if he shall survive the party of the first part, and to a further charge of Thirty (30) Dollars per month to be paid to Flora Hiram, for and

during the term of her natural life, if she shall survive the party of the first part, the last two charges upon the said net income in favor of Charles Mahoe and Flora Hiram respectively to be limited to the net income from the premises situated on the corner of Fort and Merchant Streets, in said Honolulu * * * and to be subject to the preferred and first charge created in favor of the party of the second part as hereinbefore set forth."

In connection with the termination of the trust the deed provides: "And upon the death of the last surviving child of the parties of the first and second parts, the entire trust estate and all property for the time being representing the same shall thereupon vest in and forthwith be transferred and conveyed, free and clear of this trust, *to the lawful issue of the children aforesaid then surviving,* such issue to take by right of representation." (Emphasis supplied.)

The four children named in the deed of trust, to wit, Thomas B. Cummins, Matilda K. Walker, Jane P. Merseberg and May I. Creighton, all survived the trustor and his wife. The trustor, his wife, Charles Mahoe and the four children of the trustor have all died; the trustor having died on January 21, 1913, and Charles Mahoe died before the last of the four children, Matilda K. Walker, who died on November 10, 1937. Flora Hiram (Flora Margaret Crowell) survived and is now alive.

May I. Creighton, known as May K. Clark, one of the trustor's four children, had no children by natural procreation but had, with her husband, on December 19, 1914, legally adopted Margaret Mamo Clark, an infant born December 6, 1914, under a decree of adoption duly entered by the circuit court of the first judicial circuit of the Territory of Hawaii, said decree of adoption providing: "That * * * said child be to all intents and purposes the child of said petitioners and that they and she respectively

have all the privileges and duties appertaining to the legal relation of parents and child with full rights of inheritance from and through each other, to the same extent as if she were their natural child." Margaret Mamo Clark survived May K. Clark and is now alive.

The three questions raised by the bill for instructions are: First. Does Margaret Mamo Clark take the share of income formerly paid to May I. Creighton, her adoptive mother, and accruing and payable subsequent to the death of May I. Creighton and prior to the date for the termination of the trust, to wit, November 10, 1937? Second. Does Margaret Mamo Clark take one-fourth share of the principal of the trust under provision for vesting and transferring "to the lawful issue of the children aforesaid then surviving"? Third. Does the claim of Flora Margaret Crowell for $30 per month survive, notwithstanding the provision in the trust instrument for the termination of the trust estate?

The court below decided that Margaret Mamo Clark is lawful issue of May K. Clark within the meaning of the trust instrument and entitled to a one-fourth share in the distribution of the trust estate. The court further found that the trust terminated upon the death of the last surviving child of the trustor and that the annuity to Flora Hiram ceased because of such termination of the trust and that the corpus should be distributed, free and clear of any further charges of this annuity. A decree was entered according to such findings from which decree an appeal to this court was taken.

The court below did not pass upon the question of the distribution of the income formerly payable to May I. Creighton as between the date of May I. Creighton's death, in 1935, and the date of the death of the last tenant, Matilda K. Walker, in 1937, but directed the trustee to hold such income to await the ruling upon this question

already before this court in *Walker* v. *O'Brien,* supreme court case number 2316.

Inasmuch as this court in said case has decided, *ante,* p. 13, that each of the children of the trustor took a vested estate in one-fourth of the income for the life of the trust, that question is no longer involved herein.

Consequently, there are two remaining questions presented by the appeal herein for decision. They are briefly: Is the decision of the court below correct in the result of its construction of the intention of John A. Cummins in his trust deed, executed in 1896, that he intended to include within the meaning of the phrase "to the lawful issue of the children aforesaid then surviving, such issue to take by right of representation" an adopted child of one of the children aforesaid? In other words, does Margaret Mamo Clark, the legally adopted child of May K. Clark, one of the children of the trustor, take a one-fourth share of the principal of the trust upon its termination as the lawful issue of her adoptive mother? The other question presented is whether the decision of the lower court is correct in the result of its construction of the trust instrument that the provision to Flora Hiram (Flora Margaret Crowell) of an annuity of $30 per month to be paid "for and during * * * her natural life" does not survive the termination of the trust.

The court will consider the first question first. The term "issue," shorn of any and all judicial constructions and taken in its ordinary and popular sense as used in respect to pedigree in the phrase under consideration, is definitely a general term synonymous with children, progeny, offspring, descendants, etc.

There is nothing in the etymological background of the word "issue" which suggests a more definite blood relationship than in any of its synonyms. The word is derived from the old French word of "eissue" and its roots

are from the Latin words of "ex" (out of, from) and "ire" (to go). The strict meaning of the word is to proceed out of an enclosure. Such a meaning applied literally in respect to pedigree would be limited to a child proceeding out of its mother's womb which obviously is not the usual and common understanding of the word, for a man in the general understanding of the word has issue as well as a woman.

Its synonyms have similar etymological backgrounds. For instance, the word "child" is derived from the Saxon word of "cild" or "cildru" the root of which is the Gothic word of "kilpei" meaning womb. The obsolete and archaic verb transitive of the word "child" has meant in the past "to give birth to a child" or "to deliver as in childbirth" or "to bear a child." However, here again the present and common understanding of the word is more liberal and applies equally to a man as to a woman.

Etymologically speaking, it is clear that, although the word "issue" and its synonyms may have basically different origins, they have practically the same meanings when used in the same text and can be interchangeably used without destroying the substantial sense thereof, and the word "issue," as used in the phrase before the court, is a general term which does not technically distinguish itself within the line of pedigree from the conceptions of any of its synonyms.

Consequently, it is not surprising that some common law courts have confirmed this ordinary and everyday understanding of these words in the construction of documents and statutes similar to the terms of Hawaii's adoption statutes since 1915. Several of these cases are cited in *Estate of Kamauoha*, 26 Haw. 439. One of such is *Sewall* v. *Roberts,* 115 Mass. 262, wherein it is said by the court that "The term 'heir of the body' is a well established technical term with which the words 'children' or

'issue' or 'lawful issue' are not synonymous. * * * The terms of the settlement, above cited, do not limit the estate expressly 'to the heirs of the body' of Roberts; and the terms therein used, 'child' or 'children,' 'issue' and 'lawful issue,' are not equivalent terms, and do not lead to the same construction and legal result as would be reached if the estate was in direct words limited to the heirs of his body. We are therefore of the opinion that the case does not fall within either of the exceptions of the statute, and that, as to the property in question, Ada Parker Roberts is to be deemed the child of Robert Roberts, the same as if she had been born to him in lawful wedlock."

Another example of the construction of the meaning of words is found in *Tirrell* v. *Bacon*, 3 Fed. 62, wherein is found the following language: "It is argued that the will expresses a general intent to favor those who were of the testator's blood, by its final limitation over to his heirs if his children's children should leave no issue. But the cases decide that an adopted child is a child, and is issue, and no general inferential intent can overrule the language."

This *Tirrell* case is especially interesting due to the fact that the above language breaks through the blood preference presumption of fact in a common-law jurisdiction and the case is further important because of the fact that the court had before it a will containing the phrase "to the lawful issue then living" which is quite similar in import to the phrase in the trust instrument before this court, i.e., "to the lawful issue of the children aforesaid then surviving."

The *Kamauoha* case is based upon the construction of the statutes and also is an example of the liberal construction of the word "issue" to include adopted children as part of the lawful lineal descendants of the ancestor under the statutes then existing.

112

However, these illustrations are given purely as an example of the construction of words, for this court is well-aware of the principle of law that no statute can operate retroactively upon the intention of a trustor already effectual, so as to turn the distribution of the trust into a different channel from that selected by the trustor, nor put into the power of anyone having an opposing interest to change, enlarge or prevent the happening of a contingency upon which, as indicated by the trustor, the distribution of the corpus of the trust depends.[1]

The case of *Machado* v. *Kualau*, 20 Haw. 722, is a startling example of a construction placed upon the word "issue" by the supreme court of Hawaii which violates every illustration already given herein of the meaning of the word "issue" both from the strict meaning and from the common understanding of the word, as well as being contrary to the technical meaning of "children of the blood" which counsel have urged upon this court.

This *Machado* case holds that a bastard child from out of the womb of the daughter is not "issue" of the child's grandfather and says: "It is well settled that in the absence of any language clearly expressing the contrary the words 'child,' 'children,' and 'issue,' and similar words descriptive of classes who are to inherit, do not, when used in statutes of distribution, include illegitimate children."[2]

Such a holding that an unlawful blood child is not the issue of its own grandfather was not drawn from any ancient Hawaiian customs or usage, but directly from a harsh fiction of the English common law. The court explains the theory behind its unique construction in the following language: "By the common law of England an

[1] *Jenkins* v. *Jenkins*, 64 N. H. 407.

[2] *Hayden* v. *Barrett*, 172 Mass. 472; *Truelove* v. *Truelove*, 86 N. E. 1018; *McDonald* v. *Railway*, 144 Ind. 459.

illegitimate was regarded as a child of no one and as incapable of inheriting from any one."[3]

So much for the meanings of words. The court will now consider the argument of counsel that it should follow the precedents which they have cited from other American courts and from English courts which have established a rule of judicial construction, clothing the word "issue" when used in a will or trust instrument, with a special legal significance which limits and restricts it to the technical meaning of "the children of the blood," unless the context of the instrument or the surrounding circumstances indicate a different intention on the part of its user.

From a study of the authorities this appears to be the general rule of construction throughout the United States and England. The theory, in these jurisdictions cited by counsel, behind such a rule is the presumption already referred to in the *Tirrell* case that a trustor prefers his own blood to that of a stranger to his blood, unless the contrary clearly appears. Such a strict construction in excluding adopted children upon the presumption of blood preference is reasonable and is merely another way of saying that a man is presumed, unless the contrary is shown, to intend to pass his property to those members of his family who were known to have a legally recognized relationship and status by virtue of the common law, for upon a closer study of all these jurisdictions, it is found that without exceptions the respective common laws of each do not know of the adoption relationship and therefore do not sanction adoptions, nor recognize them as a status, nor attach any legal significance whatsoever

---

[3] 1 Blackstone, Commentaries, p. 459; 2 Kent's, Commentaries, p. 275; 4 Kent's, Commentaries, p. 445; *Pratt* v. *Atwood*, 108 Mass. 40; *McDonald* v. *Railway, supra.*

to any of the phases of the relationship.[4]

It is also found in most of these jurisdictions that their respective legislatures have in comparatively recent years enacted many laws differing greatly in their terms and provisions and bestowing upon adopted children various rights, which often included the right of inheritance from the adoptive parents. Such varied enactments, in view of their respective common laws which do not recognize the existence of the legal status of adopted children, can only bestow upon such adopted children rights which were not in existence prior to such legislation and hence such legislative Acts have been strictly construed by their courts as being in derogation of the common law and any recognition, which may appear in these enactments of a new relationship unknown to the common law, would necessarily be strictly construed so as not to extend it in derogation of the common law beyond the clear and manifest intention of the legislature.

However, in spite of this nonrecognition of the adoption status by the common law, the courts have nevertheless considered the surrounding circumstances, such as an adoption by the trustor or by his immediate family before execution or the prior passage of adoption statutes defining the effect and status of adoptions in construing the intention of a trustor to include adopted children within the line of his pedigree, upon the theory that such surrounding circumstances must reasonably have been considered by the trustor and were in his mind at the time and therefore tend to reflect his intention.[5]

---

[4] "The *status* of an adopted child, unknown to the common law, may now be created in nearly all the states by proceedings authorized by legislative action." *Morse* v. *Osborne*, 75 N. H. 487, 488.

[5] "Where the grantor or testator is the adopting parent it is reasonable to presume that the adopted child was within the intended bounty of such grantor or testator." *Wilder* v. *Wilder*, 102 Atl. (Me.) 110.

Consequently, in such jurisdictions where a trustor used the word "issue" in a trust document requiring judicial interpretation in the absence of such surrounding circumstances, the courts have construed the trustor's intention by limiting this word to its narrow and technical meaning, i.e., "the children of the blood." To do otherwise would clearly violate the trustor's intention by saying that he intended in the use of a general word to include something beyond the conception of the common

"It is quite manifest that the testator did not have in mind the devolution of the title of any portion of his estate on an adopted child of either of his children for the reason that there was no law of this state under which such adoption could be had until 1877" which year was subsequent to the execution of the will. *Stout* v. *Cook*, 75 Atl. (N. J.) 583, 588.

"Intrinsically, the will shows the testator's intention to limit his bounty to his kin, and the fact that the child was not adopted until after the execution of the will precludes an intent to include the child." *Dulfon* v. *Keasbey*, 162 Atl. (N. J.) 102.

*Rodgers* v. *Miller*, 182 N. E. (Ohio) 654, where the deed was executed in 1914, in trust to his children and if a child died without issue, then over. The trustor died in 1928, but one of his children adopted two children in 1923 and 1925 and died then in 1930. The court held that at the time of execution he did not know of the later adopted children who were then not in existence and it is presumed he intended only natural children.

*Middletown Trust Co.* v. *Gaffey*, 112 Atl. 689, where a child was not adopted until after the death of the testator, held not to be issue.

See Thompson, Construction of Wills (1928), § 159, where the rule is laid down that "when in a will a provision is made for 'a child or children' of some person other than the testator, an adopted child is not included, unless it is manifest from the context and surrounding circumstances, taken in connection with a statutory provision investing an adopted child with the right of inheritance from the adopting parent, it clearly appears that such adopted child was intended to be included." (The cases cited thereunder show the statutory provisions to be in existence at the time of the execution.)

*Jenkins* v. *Jenkins*, 14 Atl. (N. H.) 557.

*In Re Puterbaugh's Estate*, 104 Atl. (Pa.) 601.

law, where such an intention was not indicated in the document, nor by the surrounding circumstances.

In a case where the document itself and the surrounding circumstances throw no light upon the intention of a trustor, the common law becomes the key to the situation and controls as a guide and aid to the court in its judicial function of construing his intention. For lack of a better analogy, the common law may be likened unto the subconscious mind from which may be drawn the explanation of and which may clarify an otherwise obscure thought or reaction of the conscious mind. So the common law, as a sum total of a people's past legal experience or as their legal heritage and background, may be drawn upon by the courts to construe and interpret the intent of a user and the meaning of a written word whether used by an individual or by a legislature whenever it may be necessary.

Hence the theory supporting the general rule in these courts of strictly construing and limiting the word "issue" to its technical meaning of blood children upon the presumption of blood preference which excludes adopted children as being in derogation of the common law, is understandable and sound. However, it is obvious that such a theory would not be sound and a totally different problem of construction would face an equity court in a jurisdiction in which the ancient customs of its people had not only sanctioned adoptions and regarded adopted children as children of the blood but also considered the status as a very sacred relationship without any trace of discrimination or prejudice toward adopted children in favor of blood children. With such "common law," ancient customs, usage or heritage to draw upon, an equity court would have to resort to a fiction not quite as harsh as the one found in the *Machado* case, *supra,* if it desired to indulge in a presumption that a man would prefer blood

children to the prejudice and exclusion of adopted children within his line of pedigree.

In a case where the status of adoptions was fully developed by ancient customs and usage as the law of the land, a subsequent enactment by the legislature providing a procedure for adoptions would merely, in effect, be an Act to preserve the rights already accrued to adopted children and a subsequent enactment defining the status of adopted children for the purpose of intestacy which was substantially the same as it existed prior thereto by ancient customs, would in effect be the mere codification or crystallization of rights already in existence.

Before analyzing the Hawaiian decisions, it may be helpful briefly to call attention to historical differences which set Hawaii apart from other commonwealths.

Hawaii is a group of islands in the Pacific Ocean, more than two thousand miles from the nearest mainland. It was peopled centuries ago by Polynesians, the racial origin of whom remains today a mystery to students of anthropology. This proud race without any apparent outside influence from other peoples had developed a fairly high civilization before the first white man visited its shores. Their customs and feudal system of government by chiefs and lesser chiefs run back many, many centuries to time immemorial. Hawaiian folklore extends back to a distant time before their Polynesian ancestors embarked from somewhere in the Pacific Ocean thousands of miles to the south and before they navigated by the stars in open outrigger canoes for Hawaii, as recorded by word of mouth and as chanted from one generation to another. It should be also borne in mind that when Hawaii voluntarily became annexed to the United States of America, although she declared by legislative Act[6] that the common

[6] R. L. 1935, § 1.

law of England as ascertained by English and American decisions was her common law as modified by the Constitution of the United States and by the laws of the United States and of the Territory of Hawaii, Hawaii nevertheless did not turn her back completely on her past, for she definitely preserved as an exception thereto that which had been fixed by Hawaiian judicial precedent or established by Hawaiian usage.

A careful study of all of the Hawaiian decisions upon adoption reveals that they may be regarded from four different angles. The first are decisions or parts of decisions in which are recognized the ancient Hawaiian customs and usage of adoptions.[7] The second includes cases where the court's attention was riveted upon the terms of particular agreements of adoption.[8] The third is composed of cases where purely procedural matters are before the court, such as the recording of an agreement of adoption.[9] The fourth are cases where the courts are concerned primarily with the construction of the adoptive statutes before them.[10]

It is also interesting to note that there are three stages of time dealt with by the Hawaiian decisions. The first stage is a time before any written law upon adoptions was enacted. In this type of case the court's main problem

---

[7] *Estate of Hakau*, 1 Haw. 471 (1856) ; *Estate of His Majesty Kamehameha IV*, 2 Haw. 715 (1864) ; *Mellish v. Bal*, 3 Haw. 123 (1869) ; *Estate of Maughan*, 3 Haw. 262 (1871) ; *Kiaiaina v. Kahanu*, 3 Haw. 368 (1871) ; *Estate of Nakuapa*, 3 Haw. 342, 410 (1872) ; *Souza v. Sao Martinho Soc'y.*, 24 Haw. 643 (1919) ; *Estate of Kamauoha*, 26 Haw. 439 (1922).

[8] *Abenela v. Kailikole*, 2 Haw. 660; *Estate of Maughan, supra*; *Estate of Namauu*, 3 Haw. 484; *Wei See v. Young Sheong*, 3 Haw. 489; *Estate of Wilhelm*, 13 Haw. 206.

[9] *Abenela v. Kailikole, supra*; *Estate of Nakuapa, supra*; *Black v. Castle*, 7 Haw. 273; *Paris v. Kealoha*, 11 Haw. 450; *Re Wikoli*, 23 Haw. 241.

[10] *Leialoha v. Wolters*, 21 Haw. 304; *Estate of Kamauoha, supra*.

was to decide whether or not the evidence adduced properly established an adoption (hookama) * as distinguished from a mere foster-child relationship (keiki hanai).* The fact that there were ancient customs (or usage) of adoptions which made an adopted child into one's own or blood child, was never questioned by any of these cases, but on the contrary, was clearly recognized; the only question being, did the proponent, advancing a right of inheritance based upon an ancient adoption, establish his claim with sufficient clarity? This would be the natural and expected problem of any court in dealing with a particular relationship which must be established by oral evidence so as to set it apart from other lesser relationships. To correct this difficulty, the second stage of time came into being. The legislature of Hawaii in the first written law of adoptions in 1841 and by succeeding enactments up to the Act of 1915 provided methods whereby the terms of adoption could be written and recorded. These Acts solved the difficulty of distinguishing an adoption from other lesser relationships by oral evidence but created a new problem of construing the terms and effect of written agreements. During this stage the courts wrestled with this new written problem, which apparently was just as difficult for them as the old one, and added to the written problem was the question of procedure. To solve and put an end to the main problem of the second stage, which was the construction of the terms and the effect of a written agreement, the legislature inaugurated the third and last stage in 1915 by enacting a statute defining the legal effect of adoptions and clearly setting out the status of adopted children whether made by decree, judgment or agreement. The courts under this statute and its succeeding amendments consequently changed their emphasis from

---

* Hawaiian words to be later discussed herein.

a construction of the agreement to construction of the statutes and recognized the right of inheritance in intestate estates as being in the power of the legislature which admittedly has always had the right to determine who shall inherit in every jurisdiction.

These three stages should not be mistakenly confused as indicating a development or growth of the law of adoptions of Hawaii from ancient times up to the present time. However, they do represent a history of the procedural growth of adoptions from the fully developed (hookama) adoption status of ancient times up to its crystallization in the legislative Act of 1915 and subsequent enactments.

Consequently, the most important question by far to be asked of the Hawaiian decisions, where the construing of the intent of the user in respect to adopted children of a general word such as "issue" becomes necessary, is whether they recognize or deny the ancient Hawaiian customs or usage of adoptions. The court will set out the pertinent language of the decisions so that they may speak for themselves.

The first recorded case of Hawaii is the *Estate of Hakau*, 1 Haw. 471. Although the evidence adduced by oral testimony was that the claimant Manoa had lived for a great length of time in the alleged adoptive parent's (Hakau) family, it was held to be unsatisfactory to show a formal adoption; the court, however, said: "Had Manoa been adopted by Hakau as her son, in due form of law, he would have been sole heir to her estate, upon her dying intestate."

In the case of *Estate of His Majesty Kamehameha IV*, 2 Haw. 715, 724, 726, the court said: "His Majesty King Kamehameha III. had no surviving child of his own, but had adopted his nephew, Prince Alexander Liholiho * * * and he was entitled as the adopted son of Kamehameha

III., to inherit the remainder of his estate not devised to any one else, subject to dower."

This court is well-aware of the fact that the above quotation and that in the *Hakau* case are both examples of sheer *obiter dictum*; however, they are cited as early voluntary expressions by the supreme court as a part of and as a prelude to its composite recognition of the effect of adoptions made under ancient Hawaiian customs and usage.

The next case is *Mellish* v. *Bal*, 3 Haw. 123. It is interesting because it throws light on why oral evidence was necessary, not to establish the unwritten law of Hawaii by ancient customs, but to bring the adoption claimed into the hookama relationship as distinguished from keiki hanai relationship. The entire decision is as follows: "HARTWELL, J.: If the usages in regard to the force and meaning of adoption prior to 1841, had been uniform, so as to establish a custom having the force of law, in *all cases* of adoption, this case would present a different aspect; for proof of the unwritten law of the land is never required. But no one would claim that every relation of *keiki hanai* carried the inheritance. No evidence was adduced of the ancient customs of Hawaii, on which either the Court· or jury could infer an inheriting relation between Lawrence and plaintiffs' mother. On this ground, on motion, a non-suit was ordered. The offer of evidence on the part of the plaintiffs, was too late after they had rested their case, and the defendants' motion had been made and the argument was closed."

The next case upon the subject is interesting, although the recognition is found in the dissenting opinion of Chief Justice Allen, as the first discussion of the ancient Hawaiian customs and usage of adoptions. The statements were uncontradicted by the majority opinion which confined its decision to the written agreement before it and

the recognition made in the dissenting opinion is in harmony with a later finding of the supreme court upon evidence before it. The pertinent statements of the dissenting opinion as recorded in *Estate of Maughan,* 3 Haw. 262, 263, 264, are as follows: "There can be no doubt that there was an adoption, which was recognized in ancient times as giving the right of inheritance. It was very wisely determined by the Legislature that this relationship, which was regarded by the Hawaiians as very sacred, should be established in writing, so that it should not depend on testimony which might become uncertain from length of time. * * * In view of the customs and usages of the Hawaiians in relation to adopted children, and in view of the express language of the articles of agreement, can there be a doubt that when they speak of their children, they include those adopted as well as those by blood?"

The next case where the supreme court spoke confirms the recognition in the dissenting opinion referred to. The pertinent language as recorded in *Estate of Nakuapa,* 3 Haw. 342, is as follows: "Before written laws are passed by the legitimate authorities of a nation, the customs and usages which have long prevailed, and have been universally recognized, have the same force of law as those subsequently passed and incorporated in a Code. The evidence, however, must be clear and complete in regard to the custom and usage. (p. 342.) * * * It is unnecessary to give a detail of evidence in relation to the custom and usage which prevailed in relation to adoption, prior to the written law, for it is admitted that it was a very general custom among the people. Under the general term of adopted children, there were various relations to the adopted. Some were mere foster children, taken to nurse and to exercise a parental care over, and for a temporary purpose; others were adopted as one's own children to be

cared for, to live with the adopter as such; and it is necessary that the relation should be clearly defined by competent evidence in relation to the precise terms of the original contract. (p. 343.) * * * The Court is of opinion that there were children by adoption who were regarded in all respects as one's own children, and that in the enactment of laws, the same terms were applied *to them* as to the children of the blood, that is, they were regarded as the intestate's children. The majority of the Court are of the opinion that there was, prior to the written law, a custom and usage which recognized an adoption, if clearly defined in the contract, by which the child adopted might be an heir to the property of the adopter. The principle of adoption was cherished by the Hawaiians. (p. 347.) * * * As adoption was recognized by the ancient customs and has continued to be by the laws of the Kingdom, it is evident that it was a relationship endeared to the people, and regarded by them of the highest importance. Is it reasonable to suppose then, that it imparted no rights—that it was the relationship of a day, and for a comparatively unimportant purpose? To the Hawaiian, it was a sacred relation, and having all the rights, duties and obligations of a child of the blood; and the opinion which the majority of the Court entertain is, that by ancient custom and usage an adopted child was an heir of his adopted parents, when so stipulated, and that the same view of these rights of the adopted child was entertained by the different Legislative bodies of the Kingdom, although the specific term is not used in the law of descents. But the evidence as to the right of the *keiki hanai* to inherit, is somewhat conflicting, and the Court are uncertain what the intention of the jury was in rendering the verdict, by the terms used, and therefore they regard it as an act of justice to the parties, that a new trial should be granted. The verdict is not clearly respon-

sive to the issue, and it is the judgment of the Court that the verdict of the jury be set aside and a new trial granted. * * * The adoption of a child as heir, clearly and definitely made according to Hawaiian custom and usages prior to the written law, I hold to be valid under existing laws, and I therefore concur in the decision of the Chief Justice, that as far as the verdict of the jury is clearly not responsive to this issue, a new trial should be granted." (pp. 347-348.)

This case also is important in showing some uncertainty in the court's mind as to what the jury meant by a *keiki hanai* relationship, as distinguished from the true adoption (hookama) status, in respect to the right of inheritance.

The next case is *Kiaiaina* v. *Kahanu,* 3 Haw. 368, which succinctly recognizes the ancient Hawaiian custom and usage of adoption in the following language: "It was decided by the Court in the case of Keahi, appellant, vs. Kaaoaopa, appellee, that an adoption of a child as heir, according to Hawaiian custom and usage, made prior to the written law, is valid under existing laws, and as we are of opinion that the defendant Kahanu was legally adopted in conformity to said custom and usage, he has rights of inheritance. And as it appears that he is now in possession of the property, he is entitled to judgment in this case."

The next case is *Souza* v. *Sao Martinho Soc'y.,* 24 Haw. 643, in which appears the following language: "While it is true that adoption in its legal sense was unknown to the common law and is a creature of statute in the several states, the majority of which based their statutes upon the civil law, it is beyond question that Hawaii was an absolute monarchy independent of and uncontrolled by the laws of any country. 'He (the King) is the sovereign of all the people and all the chiefs. The kingdom

is his. * * * He shall be the Chief Judge of the Supreme Court.' Constitution of 1840, Kamehameha III. That adoption in the broadest sense was practiced among the Hawaiians from very remote times is incontrovertible and most probably was derived from the mammalian instinct, although at times it appears to have been resorted to for the purpose of evading some public duty."

The most recent indication of the recognition by the supreme court of this ancient custom and usage of adoptions is found in the case of *Estate of Kamauoha,* 26 Haw. 439, 448, in the following two sentences: "In ancient Hawaii adoption had a strong hold. Children were given and received freely in adoption."

It is clear from all of these expressions and findings of the supreme court in the past that ancient Hawaiian customs and usage existed prior to any written law in Hawaii in respect to adoptions wherein the adopted children were regarded as blood children with the right of inheritance and that nowhere in the Hawaiian decisions appears any statement or finding which could be reasonably construed as a denial that such existed, regardless of the insufficiency of the evidence which appeared in many instances to establish the blood (hookama) status carrying with it the right of inheritance. Consequently, it is the opinion of this court that such customs and usage existed and that they may therefore be drawn upon by courts in construing the intention of a trustor in the use of the word "issue" where the intention is not clearly indicated in the context of the instrument itself or from the surrounding circumstances.

Such a situation in Hawaii's legal heritage is more comparable to the civil law which recognizes adoptions, than to the common law which does not.[11] The common

---

[11] "In England there is no adoption at common law or under statute,

126

law authorities cited have, therefore, little or no value as precedents in Hawaii except those illustrations of the construction and meaning of words already referred to herein. Consequently, in the nature of things, these common-law jurisdiction decisions must be based upon the construction of their statutes[12] and as aptly stated in *Estate of Kamauoha, supra,* p. 442, "It is an often-repeated statement, as true today as it ever was, that when decisions are based upon statutes they must be examined and read each in the light of the statutes prevailing in its jurisdiction and that they cannot be regarded as authority for or against a particular proposition of law simply because the one conclusion or the other is there reached." To make this statement complete, however, an amendment should be made to the effect that such decisions must also be examined in the light of the common law and to make it even clearer in respect to Hawaii they must be examined also in the light of any exceptions made by statute to the common law as fixed by Hawaiian judicial precedent or as established by Hawaiian usage. Upon such an amplification, the *Kamauoha* case becomes immediately distinguishable from any decision made in any other jurisdiction in any other part of the world and the liberal definition of the word "issue" in section 3245,

and the same is true of Ontario and British Columbia. In the United States adoption exists only by statute, based to some extent in some states on the civil law, particularly where the state's jurisprudence is derived from the civil law. Such statutes began to be adopted about the middle of the nineteenth century, and they have now been enacted in practically all the states." 2 C. J. S., pp. 370, 371.

[12] Where the statutes are broad and comprehensive in their terms the testator is generally held to have intended to include a child of adoption within the term child or children and those States having a more restrictive statute the opposite conclusion is arrived at in the absence of other elements showing or tending to show an intent to the contrary. (*Mooney* v. *Tolles,* 111 Conn. 1, 149 Atl. 515.)

R. L. 1915, to include "all the lawful lineal descendants of the ancestor" becomes more understandable as well as throwing light upon the construction of the court that the word "issue" and the words "children," "kindred" and the like in statutes of descent and distribution include adopted children in the absence of anything indicating a contrary intent.[13]

There is nothing from the context of the instrument which clearly indicates what the intent of John A. Cummins was when he used the word "issue."

However, some of the surrounding circumstances tend to throw light upon his intention. The record shows that he was a part-Hawaiian of sufficiently advanced age to have grown children at the time he executed the trust instrument in 1896. It is therefore a reasonable assumption that he was born near the close of the era of unwritten law ending in 1841 and therefore nurtured by a generation reverently familiar with the ancient Hawaiian customs and usage of adoptions as the law of the land. It is also reasonable that he absorbed the atmosphere of this generation and that knowledge thereof was imparted to him according to the habit of Hawaiians to relay from one generation to another their folklore and pedigrees. As an intelligent part-Hawaiian it is reasonable to assume that he would acquaint himself with these customs and be aware of their recognition by the Hawaiian supreme court[14] during his lifetime and prior to the execution of his trust deed in 1896.

In this connection, the court takes judicial notice that Act 144, L. 1911, in the first paragraph of its preamble, says: "Whereas, it appears that John A. Cummins,

---

[13] See quotation from 1 C. J. 1398, as quoted on page 464 of the *Kamauoha* case.

[14] See note number 7 herein as to the dates of the decisions in which this recognition is found.

*a descendant of one of the High Chief families of Hawaii,* and *a man who has occupied honorable positions under the late Hawaiian Monarchy,* was arrested on the 16th day of January, A. D. 1895, and charged before a Military Commission with the crime of Treason." (Emphasis supplied.)[15]

The record shows that he married into the Hawaiian race and consequently it is reasonable to assume that he was acquainted with the common everyday meaning of ordinary Hawaiian words as defined by dictionaries in use in 1896 and prior thereto.

The oldest of such dictionaries was the "Dictionary of the Hawaiian Language" compiled by Lorrin Andrews and published in 1865 under the authority of the Hawaiian Board of Missions and based on one of Lorrin Andrews' prior dictionaries published in 1836. In this dictionary the word "hookama" is given the meaning of "to adopt, as a child; to make the child of another one's own." "Hookama" is composed of two Hawaiian words, "hoo" and "kama." "Hoo" is given the meaning of "adoption; the act of receiving or being received, as a child into the family of another; ka hookamaia, adoption. Rom. 9 : 4." The Biblical citation given is as follows: "Who are Israelites; to whom pertaineth the adoption." "Kama" is given the following meaning: "Specifically, children adopted into the family of another; kama ole, childless." Another meaning of the word "hoo" is given as "to cause to enter" which taken together with the Gothic root of

---

[15] *In re Cummins,* 20 Haw. 518, 519.

History further shows in corroboration of the "honorable positions" occupied that John A. Cummins held the following positions under the Hawaiian Monarchy: Member of Privy Council, June 18, 1874, of House of Representatives, 1874, of Board of Immigration, 1886, of Commission to Paris Exposition, 1889, of House of Nobles, Oahu, 1890, and was the Minister of Foreign Affairs, June, 1890, to February 26, 1891.

"child" would approach in significance the Christian term of "being born again." In this connection it is interesting to note that the words "hookama ha'o" are given the meaning of "to be or to do something wonderful; to be transformed; to take a new form, especially a more splendid form." It is significant that the English-Hawaiian vocabulary as a part of this Hawaiian dictionary gives only one Hawaiian equivalent to the English word "adopt" which is "e hookama."

The only other dictionary in existence at the time, which the court was able to find, was printed in 1887, nine years before John A. Cummins executed his deed of trust. It was entitled "English-Hawaiian Dictionary," compiled by H. R. Hitchcock, and also gives the sole Hawaiian meaning of the word "adopt" as "e hookama."

However, both dictionaries define another relationship which is not defined as an adoption at all. This relationship is a foster-child or ward relationship. The Hawaiian equivalent to this relationship is given as "keiki hanai." The English equivalent is given as "foster child" or "ward." The word "hanai" in the older dictionary is given the meaning of "to feed, to nourish, to support those in need; to entertain, as strangers, etc.; also, one fed or sustained by another; a foster child or a ward." The "keiki hanai" relationship supplies the reason why the courts required that oral evidence, supporting an ancient adoption, must be clear and concise so that it could be definitely distinguished from a mere foster-child or ward relationship.

Such surrounding circumstances reasonably show a situation where John A. Cummins had lived all of his natural life, at the time he executed his trust deed in 1896, in an atmosphere where adopted children were known by the people and considered as blood children, the status of which was held by them to be a sacred relationship, recog-

nized in the recorded decisions of the highest court of the land and reflected by ordinary Hawaiian words in use at the time. Such circumstances are positive and, it is reasonable to assume, were known and absorbed by him as an intelligent part-Hawaiian and which would reasonably and materially influence his entire mental outlook and conception of life, as well as being indicative of his intention in respect to adopted children within his line of pedigree.

The other circumstances surrounding the execution are, briefly, the lack of any adoptions in the Cummins family and the fact that the trustor was a stranger to and died before the Clark adoption and before the legislative Act of 1915 defining the adoption status for the purpose of intestacy. These later circumstances are of negative significance and therefore were incapable of containing positive suggestions to the mind of the trustor which could be made the basis from which an intention to include adopted children could be reasonably inferred. This is true in Hawaii as well as in other jurisdictions. It is also true that if such negative circumstances were all the circumstances surrounding the execution of this trust deed, a court in a jurisdiction other than Hawaii would immediately invoke the presumption of blood preference to them and thereby harmonize their negative import with the common-law negative conception in respect to adoptions in construing the trustor's intention to exclude adopted children.[16]

However, as already pointed out, there were positive circumstances surrounding the execution of the deed and it is a matter of common sense in any jurisdiction that positive circumstances are greater in effect than are negative circumstances in that positive circumstances tend to stamp a more vivid and a more lasting impression upon a

---

[16] See note number 5 herein.

man's mind. John A. Cummins had crowded upon his consciousness such positive circumstances, rich in the contemplation of adoptions, as a part of his everyday life, which, it is reasonable to assume, completely outweighed, in the effect upon his mind, any effect which negative circumstances might otherwise have had. In addition, he was of a generation which began near the close of a colorful era, centuries old, of unwritten law wherein adoptions were recognized as a part of the life of the people and as a general custom and usage, endeared and revered by the people. In this connection, it is significant that King Kamehameha III adopted Prince Alexander Liholiho, who was publicly proclaimed to be the successor to the throne in the month of April, 1853, and ascended to the throne after the death, on December 15, 1854, of his adoptive father.[17] Such a general and highly respected usage of a people, who formed a civilized nation of their own, can be reasonably called a national usage and as such comes within the recognition afforded "Hawaiian national usage" as an exception to "the common law of the Hawaiian Islands" by the Act of the legislature of the Hawaiian Monarchy in 1892 under Queen Liliuo-kalani.[18]

In respect to such a trustor a presumption of fact that he intended to include adopted children and not to discriminate against them in preference to his blood, unless the contrary clearly appears from the context of the deed and from the surrounding circumstances, in harmony with

---

[17] *Estate of His Majesty Kamehameha IV, supra.*

[18] L. 1892, ch. 57, § 5.

In 1903, this Act was amended and the phrase "established by Hawaiian national usage" as an exception to "the common law of the Hawaiian Islands" was changed to the phrase "established by Hawaiian usage" as an exception to "the common law of the Territory of Hawaii." L. 1903, Act 32, § 2.

the ancient Hawaiian customs and usage of adoption, the unwritten era of which was not so distantly removed from the time of execution, would be more in order than the reverse blood-preference presumption of the less familiar and more distantly removed common law of England.

It is also a reasonable assumption under all of such positive circumstances that if John A. Cummins had desired to discriminate against and to eliminate adopted children as strangers to his blood, he would have done so by simply saying "to the lawful issue of my blood" or "to the heirs of my body" or "to my blood children" or similar words indicating a clear limitation to the blood.[19]

Consequently, considering the context of the trust deed and all of the surrounding circumstances of its execution and drawing upon the ancient Hawaiian customs and usage of adoption as a statutory exception to Hawaii's common law, this court construes the intent of John A. Cummins in his use of the phrase "to the lawful issue of the children aforesaid then surviving," to include within the meaning of the words "lawful issue" an adopted child of one of his children, lawfully adopted on December 19, 1914.

The intent of John A. Cummins is the cardinal rule governing this court's construction and that intent must prevail so long as it is not contrary to some positive rule of law and hence no legal fiction nor a non-Hawaiian, technical or a strained construction shall be permitted to nullify it.

---

[19] "If the settlor had intended that in the distribution of the corpus Edward's heirs at law of the Dreier blood should be the sole distributees of the corpus she could have easily expressed such an intention and naturally would have done so. Not having expressed such intention we are not authorized by the proviso to paragraph 5 of the statute to exclude from the distribution of this estate the heirs at law of Edward on his mother's side." *von Holt* v. *Dreier*, 34 Haw. 131, 136.

The phrase "to the lawful issue of the children aforesaid then surviving" are words of purchase, and simply means those lawful surviving children who shall take at the happening of the contingency, and who they may be at that time can only be ascertained then. It is in effect a designation of a class who are to become the recipients of the trustor's bounty to be determined at the time of taking after the postponement made by the trustor and, taken together with the trustor's general intent to include adopted children within the line of his pedigree for the purpose of trust distribution, it is merely another way of saying that he intended that the law and the fact of survivorship at the time of the happening of the contingency should be the deciding factors as to who specifically shall take.[20]

It is therefore the opinion of this court that the first question under consideration be answered in the affirmative, i.e., that adopted children were intended to be included within the term "lawful issue" by John A. Cummins; that Margaret Mamo Clark, as the adopted child of one of his children, was "lawful issue" within his meaning and intention; that she became "lawful" issue when she came within the line of his pedigree by virtue of the fact that the adoption was lawful and that the lawful status thereof continued without interruption up to and beyond the definite time fixed by him for the termination of his trust and the vesting of the corpus, at which time she was surviving, and consequently is now entitled to her share thereof by the right of representation in accordance with the intention of John A. Cummins.

The final question to be answered in respect to the

---

[20] *Honolulu Investment Co.* v. *Rowland,* 14 Haw. 271; *Auld* v. *Andrade,* 31 Haw. 1; *von Holt* v. *Dreier, supra; Fernandez* v. *Andrade,* 59 F. (2d) 681; *O'Neil* v. *Dreier,* 61 F. (2d) 598.

134

survival of Flora Hiram's $30 per month annuity over the complete termination and distribution of the trust estate must be answered in the affirmative.

The deed provides that upon the death of the trustor, "The net income * * * shall be subject only to the" allowance of $150 per month to the trustor's wife "for and during the term of her natural life * * * and subject to a further charge of Twenty-five (25) Dollars per month to be paid to Charles Mahoe, for and during the term of his natural life, if he shall survive the" trustor "and to a further charge of Thirty (30) Dollars per month *to be paid to Flora Hiram, for and during the term of her natural life, if she shall survive the"* trustor. (Emphasis supplied.)

The above provision relating to the terms of payment to Flora Hiram conflicts with the provision which later appears in the trust deed as to the term of the entire trust which provides that "upon the death of the last surviving child of the parties" thereto, *"the entire trust estate and* all property for the time being representing the same shall thereupon vest in and *forthwith be transferred and conveyed, free and clear of this trust."* (Emphasis supplied.) This conflict is obviously caused by the fact that Flora Hiram survived all of the trustor's children and presents the question of whether the annuity provision also survives with her.

The intention of the trustor as to the situation which would exist at the time of the death of his last child in the event that Flora Hiram survived is not clearly expressed in his deed due to the conflicting provisions cited. However, it is not reasonable to assume that the trustor contemplated the possibility of her survivorship and then intended and ordered an impossibility, i.e., that his trust estate should provide for Flora Hiram for a term greater than the lives of his children, and at the same time at the death of his last surviving child be completely

terminated and be fully distributed to the lawful issue of his children. On the other hand, it is reasonable to assume that the trustor thought that Flora Hiram would at least predecease his last surviving child, even as did his wife and Charles Mahoe, so that the time fixed by him for a complete termination of his trust would in his contemplation become in fact a time subsequent to the death of Flora Hiram, as well as to the deaths of the other life beneficiaries, and that therefore all of the provisions of his trust could be carried out to the letter. Such, we believe, was in the mind of John A. Cummins when he executed his trust deed in 1896 and his general intent by construing all of the provisions of the deed together must reasonably have been to first provide for Flora Hiram during her life which, in the nature of things, he thought would be satisfied before the death of his last child and after that he intended that his trust should then be completely terminated.[21]

Nevertheless, from the bare language actually used, both provisions are clear and unambiguous, as well as wholly inconsistent, and hence his intention as to their execution can only be approximated. Consequently, the opinion of this court in construing the intention of John A. Cummins as to their execution is that the provision directing the complete termination and distribution of the trust estate must yield by necessity to the Flora Hiram annuity provision for the remaining period of her natural life as one of the primary purposes of the trust. Whether this may be accomplished by the outright purchase of an annuity from the assets of the estate or by the setting aside of a sufficient sum in trust, the final termination and distribution of which would be postponed to the time

[21] *Williams* v. *Thacher*, 186 Mass. 293.

of the death of Flora Hiram,[22] is not for this court to say. In either case, the great bulk of the corpus can be immediately distributed and the trust in respect thereto terminated.[23]

Such a complete carrying out of one of the primary purposes of the trust to provide for a specifically named beneficiary for life, as well as carrying out the approximate intention of the trustor in meeting a contingency, which it is reasonable to assume was not contemplated by him at the time of execution, is clearly an equitable solution and in harmony with the trustor's general intent. It should afford the lawful issue some satisfaction to know that, by not taking the entire estate at this time, they have not in any way been directly or indirectly instrumental in defeating and nullifying the clearly expressed intention of their grandfather and benefactor in his desire to provide for Flora Hiram during her natural life.

The court therefore denies the appeal in respect to the construction of the lower court of the intention of John A. Cummins in the use of the words "lawful issue" as including adopted children and in respect to the distribution of the one-fourth interest of May K. Clark, deceased, to Margaret Mamo Clark, as the lawfully adopted child and lawful issue of May K. Clark by the right of representation, and confirms the decree appealed from in respect thereto. The court, however, sustains the appeal of the trustee for Flora Margaret Crowell and therefore remands

---

[22] "There is no doubt as to the power of this court entirely to terminate a trust, or to terminate it as to certain property and continue it as to other in a proper case." *Weeks* v. *Pierce*, 181 N. E. (Mass.) 231, 233.

[23] 2 Perry, Trusts (6th ed.), § 920, p. 1500; *Schaffer* v. *Wadsworth*, 106 Mass. 19; *Inches* v. *Hill*, 106 Mass. 575; *Carter* v. *Carter*, 14 Haw. 505.

the cause to the lower court with instructions to modify the decree appealed from, so that the annuity to Flora Hiram may be preserved, and for further proceedings not inconsistent with the opinion in *Walker* v. *O'Brien, ante,* p. 13, and with this opinion.

*A. G. M. Robertson* (*Robertson, Castle* and *Anthony* on the briefs) for certain appellants.

*C. M. Hite* filed briefs for Herman V. von Holt, as trustee for Flora Margaret Crowell, one of the appellants, but did not argue.

*W. B. Lymer* (also on the briefs) for certain appellants.

*I. M. Stainback* (*Stainback & Massee* on the brief) for Margaret Mamo Clark, one of the appellees.

### OPINION OF COKE, C. J., CONCURRING IN PART AND DISSENTING IN PART.

I am in agreement with that part of the foregoing opinion of my associates which holds that Flora M. Crowell (formerly Flora Hiram), one of the appellants, is entitled to the annuity granted to her in the trust deed of Mr. Cummins during her lifetime. The record shows that the estate is of the approximate value of $400,000. The greater part of it can be presently distributed and a sufficient sum retained in trust to provide the annuity granted to Flora by Mr. Cummins or, as an alternative, an annuity can be purchased out of the trust corpus to accomplish the same result. I think it is reasonable to assume, as pointed out in the majority opinion, that it did not occur to Mr. Cummins that Flora would survive his four children. Otherwise, I am convinced that due to Mr. Cummins's solicitude for Flora and his express desire that she receive from his estate the annuity during her lifetime, the provision requiring distribution at the death of his last surviving child would not have been inserted

in the trust deed in its present form. We are confronted by two conflicting and wholly irreconcilable provisions in the deed and it is my opinion, considering all of the circumstances, that the one directing the payment to Flora during the term of her life of the sum of $30 per month most closely approximates the intent of the settlor.

I am, however, unable to concur in the conclusion reached by my associates to the effect that Margaret Mamo Clark, the adopted daughter of May Clark, can be deemed to be the "lawful issue" of the latter as that term was used by John A. Cummins in his trust deed. Nor am I in accord with the further conclusion that Margaret Mamo Clark is entitled to share as a distributee in any of the corpus of the trust estate. The error into which the majority, as well as the trial court, have fallen is due, in my opinion, to the failure to distinguish between an estate of intestacy which is controlled by the statutes of descent and distribution and an estate created by a trust deed in which event the intent of the trustor, as expressed in the trust document, must prevail. The Cummins trust deed was executed in the year 1896 and that instrument must now be read with a view to the circumstances under which it was written at that period. (*Chater* v. *Carter*, 22 Haw. 34, 39, affirmed 238 U. S. 572.) In order to ascertain the intent of the settlor this court should, as nearly as it may, place itself in the position of Mr. Cummins at the time he executed the trust instrument in 1896. Returning then to that period we find the settlor to be a man of property, the owner of a large estate, with a fixed purpose to make an *inter vivos* disposition of his property through the medium of a trust deed. As appears from the trust document, the primary or dominant purpose of John A. Cummins was to provide for his wife and himself suitable maintenance during the period of their respective lives, to also provide a small annuity to be paid to Charles

Mahoe (long since deceased) and to Flora Crowell during their natural lives and ultimately (i.e., at the death of the last of his children) to require that all of the trust estate be distributed to the "lawful issue then surviving" of his four children (except so much of it as would be required to provide the annuity payable to Flora). This language, considering the facts and circumstances existing at that time, clearly indicates an intent on the part of Mr. Cummins to restrict his trust property to those of his own blood to the exclusion of all others, including those who might subsequently have been adopted by any of his children.

While it is true that adoption was unknown to the old common law, it was an institution of the Roman law in very early times. Adoption was also known to the Athenians and Spartans as well as to the ancient Germans and was familiar to the writers of the new, if not the old, testament. Adoption was also an institution of Spanish law and was incorporated into the code Napoleon and from that code found its way through Louisiana and Texas into the statutes of their sister States. It is quite likely that adoption was in vogue in the Hawaiian Islands prior to the discovery of them by Captain Cook in 1778. Whether the practice of adoption in these Islands originated with the Hawaiians or was brought in by mariners from continental Europe or Asia who may have visited the Hawaiian group in prehistoric time must be left to conjecture. In Hawaii and until changed by statute adoption was by contract and if a child was taken by the adopting parents as their *hookama* it became the heir of its adopting parents. If, on the other hand, it was taken merely as a *hanai*, it was a foster child without the right to inherit. A *hookama* was at no time deemed to be of the blood of its adopting parents. A child of the blood or the issue of its parents was designated as a *keiki ponoi*, a third and closer relationship apparently not recognized by my associates.

*Ponoi* means, belonging particularly to oneself or itself either of persons or things. "Kau keiki ponoi, thine own child, in distinction from an adopted one; o ka makuakane ame kana keiki ponoi, the father and his own child." Andrews' Hawaiian dictionary, p. 563. It will thus be noticed that there was nothing unusual in the ancient laws, usages or customs of the Hawaiian people respecting adoption. They were in fact strikingly similar to the ancient civil laws and, in fact, similar to the more modern statutory laws which have been enacted within the last century throughout the United States. Here, as there, we had the *hookama,* which is an adopted child, and the *keiki ponoi,* an issue of its natural parents.

The numerous Hawaiian cases referred to and extensively quoted from in the opinion of my associates, beginning with *Estate of Hakau,* 1 Haw. 471, decided in 1856, to and including *Estate of Kamauoha,* 26 Haw. 439, decided in 1922, have to do with estates of intestacy. The right of an adopted child to take under a trust deed or a will was involved in none of them. These decisions uniformly held that where a child was legally adopted by contract or a decree of court granting to it the right to inherit from its adopting parents it became for that purpose their child and in case of intestacy would inherit. I can find no basis whatsoever for the statement made and reiterated in the opinion of the majority of this court "that there were ancient customs (or usage) of adoptions which made an adopted child into one's own or blood child." As early as 1871, in *Estate of Hannah Maughan,* 3 Haw. 262, 264, the court said: "In view of the customs and usages of the Hawaiians in relation to adopted children, and in view of the express language of the articles of agreement, can there be a doubt that when they speak of their children, they include those adopted as well as those by blood?" Here in plain language the court distinguished

between adopted children and children of the blood. And not until the decision in *Estate of Kamauoha, supra,* did the local supreme court go so far as to hold that a person legally adopted inherited through its adopting mother from her father who died intestate and was deemed for that purpose to be the issue of the adopting parent. Here again, however, the court was dealing with the right of a child adopted in 1920 to participate in an intestate estate. The statute in existence at that time (now R. L. 1935, § 4813), provided that "property shall be divided equally among the intestate's children" and at that time there was in existence a statute enacted in 1905 (Act 83, L. 1905), which provided that "An adopted child * * * shall inherit estate undisposed of by will from its adopting parents the same as if it were the natural child of such adopting parents." In view of these statutes, the court held, and correctly so, that a legally adopted child would take as issue in an intestate estate. But the statute of 1905 had not been enacted when Mr. Cummins executed his irrevocable deed of trust.

Again it should be emphasized that we are not concerned with the meaning of the word "issue" as construed by this court in determining the right of a child under the Adoption Act of 1905 to inherit the property of an intestate. Our problem is one of ascertainment of the meaning of "lawful issue" as used in the trust deed of Mr. Cummins executed in the year 1896. I think it clear that my associates, as well as the judge of the court below, failed to give due weight to the distinction. At the date of the execution of the trust deed three of Mr. Cummins's children had children and his daughter May Clark, who was then twenty-two years of age, had been married only a few months and it was a natural assumption on the part of her father that in due time she would bear children; conversely he could not be presumed to have con-

templated that she would subsequently adopt a child. Up to that time no children had been adopted into the Cummins family. Nor was there in Hawaii any statute in force at that period giving adopted children the right of inheritance.

At the time of the death of John A. Cummins in the year 1913 Mamo had not been adopted by May Clark; in fact she was not even born until after the death of Mr. Cummins. The trust deed was written in the English language and it was fair to assume that Mr. Cummins not only understood the meaning of its provisions and nothing appearing to indicate the contrary it should be further assumed that he used the words "lawful issue" in their primary, common, usual and everyday sense. The word "lawful" is an antonym of "unlawful" or "illegitimate." "Issue" when used as a noun is commonly understood to denote something that issues or emerges from something else. "To proceed as progeny." "Of thy sons that shall issue from thee. 2 Kings xx. 18." Webster's International Dictionary, p. 1318. "In common understanding the word [issue] includes natural descendants, and not children by adoption." *Morse v. Osborne*, 77 Atl. 403, 404. (See also *Welch v. Colt*, 117 N. E. 834, 836.) *In re Gurlitz' Will*, 235 N. Y. S. 705, 709, the court said: " 'Issue' is a legal term, not common in ordinary conversation, and its use is persuasive of the thought that the aim of testatrix was to limit her bounty to those in whose veins the same blood as her own coursed."

In common parlance when we speak of the issue of a person we mean a blood descendant; a child of its parents conceived by them through the process of natural procreation, thus distinguishing it from a foster or an adopted child, the latter being a relationship created artificially by contract or decree of court. Hence Mamo could not have been the issue of May Clark; she was the issue of her

own natural parents, whoever they may have been.  To say otherwise is to challenge a recognized biological fact. An adopted child "in fact, is—an 'issue' of his *natural* parents only."  *In re Russell's Estate*, 130 Atl. 319, 320. "It is well established by numerous decisions that the word 'issue' in a testamentary disposition may be given its primary meaning of heirs of the body, and descendants in any degree, or a meaning synonymous with the word child as commonly used, according to circumstances. * * * Where the intent is not otherwise clear, certain presumptions may be invoked.  One of these is the natural one, that a testator will favor heirs of the blood, and thus, in the absence of a discoverable intent to the contrary, the word will be given its primary meaning."  *Ansonia Nat. Bank* v. *Kunkel*, 136 Atl. (Conn.) 588, 590.

There is an entire absence of language in the trust deed or in the circumstances surrounding its execution which would indicate that Mr. Cummins used the word "issue" other than in its common and primary sense.  It is true, as held by the circuit judge, that the ultimate takers could only be determined at a date subsequent to the execution of the trust deed but it is equally true that the class which would ultimately take is clearly designated and limited in the trust deed and neither by an Act of the legislature nor a decree of court could that class be changed in any manner.  Had Mr. Cummins died intestate we would have an entirely different question to deal with.  In a case of intestacy the legislature may say who shall inherit the property of an intestate.  Indeed a statute might be enacted providing that the property of the deceased should be distributed among his lawful issue and further providing that the word "issue" as used in the statute should include parents of the deceased and thus by a fiction of law the anomaly might arise where parents would be deemed to be the issue of their own child.  Such a law

144

would doubtless be perfectly valid but would anyone argue that it could control the distribution of a trust estate and especially where the trust instrument had been executed long prior to the enactment of the statute?

In the *Kamauoha* case, *supra,* the court held that under the statute of 1905 and for the purpose of inheriting the estate of the father of its adopting mother, both of whom had died intestate, an adopted child became the issue of its adopting mother. The statute of 1905 was not in existence at the time Mr. Cummins executed his trust deed. The point is illustrated in *Schafer* v. *Eneu,* 54 Pa. 304, where the court said: "Adopted children are not children [i.e., by law of nature] of the person by whom they have been adopted, and the Act of Assembly does not attempt the impossibility of making them such. * * * The right to inherit from the adopting parent is made complete, but the identity of the child is not changed. One adopted has the rights of a child without being a child." (See also *Moran* v. *Stewart,* 26 S. W. 962.) Even had the statute of 1905 antedated the trust deed it could not have done the work of nature and created one an issue who by nature was a stranger.

Due to the absence of any precedents in this jurisdiction dealing with the question before us in the case at bar, we naturally turn to the decisions of other courts within our common country which may be helpful. To say that the judicial wisdom of the higher courts throughout the States should be ignored on the pretense that there was something mysterious or even unusual in the ancient or modern laws, usages or customs of the Hawaiian people in respect to adoption or the rights of adopted children, is, in my opinion, wholly untenable. In fact the early-day unwritten laws and customs of the Hawaiian people were, so far as I am able to ascertain, strikingly similar to the ancient civil laws and the statutory laws enacted in Hawaii

since the year 1840 correspond generally to the laws enacted in the several States since about that period.

Bearing in mind that Mamo Clark is an alien to the Cummins blood and that John A. Cummins was a stranger to her adoption, I am utterly unable to conceive how the settlor could have contemplated an artificial status that did not even exist until twenty years after he had executed his deed and in fact not until after his death. (See *Tankersley* v. *Davis*, 142 S. E. 765.)

The following are excerpts from a few of many decisions of the courts which, with singular accord, have spoken on the subject. *"The result reached is one of unanimity that a limitation in a deed or will to a child or children is not deemed to include an adopted child, where the grantor or testator is a stranger to the adoption."* *Ahlemeyer* v. *Miller*, 131 Atl. 54 (affirmed 137 Atl. 543). The court called attention to the fact that the child was not adopted until after the execution of the will and held that this fact precluded an intention to include it.

"In every case of doubtful construction in a will of the word 'children' the law favors ancestral blood by favoring such an interpretation as will permit the testator's estate to pass to his own blood." *Middletown Trust Co.* v. *Gaffey*, 112 Atl. 689. It is to be observed that the terms "child" and "issue" are not synonymous, the latter having of course the more restrictive implication.

"At the time that the settlor executed the deed of trust, and for many years thereafter, neither of the adopted children * * * were in existence, therefore, as individuals in the status of children of his children, could not have specifically been in the mind of the settlor. He did know, according to the record, that some of his children had natural children and that none had adopted children. * * * When a stranger to the adoption employs the language 'child' or 'children,' relating to children other than his

own, the presumption attends that he does not mean to include other than natural children. * * * *The use of the word 'issue' strengthens the theory that he had in mind only natural children of his children."* Rodgers v. Miller, 182 N. E. 654. (See also *In re Puterbaugh's Estate,* 104 Atl. 601; *Dulfon* v. *Keasbey,* 162 Atl. 102; Thompson, Construction of Wills [1928], § 159.)

A case directly to the point is *Wilder* v. *Wilder,* 102 Atl. 110, where the court said: "What is the legal effect of the present statute regulating adoption so far as property rights are concerned? In strictness it simply fixes the status of the adopted child in case of the intestacy of his adopters, where the rights of inheritance are involved. It is also held to have a bearing upon the intention of the grantor or testator who is himself the adopter. But it is of no particular aid in determining whether an adopted child is within or without the designation of 'child' or 'children' as used in a deed or will where the grantor or testator is other than the adopter. The right of inheritance by the adopted child is a matter of statutory creation; the taking under a deed or a will depends upon the intention of the grantor or testator, as revealed by the instrument itself construed in the light of the surrounding facts and conditions. *Where the grantor or testator is the adopting parent it is reasonable to presume that the adopted child was within the intended bounty of such grantor or testator. But where he is a stranger to the adoption such presumption does not prevail. The distinction between the limitation of the statute to the inheritance rights of the adopted child and the rule governing the construction of a deed or will of a stranger to the adoption is clear,* and it has been observed in previous decisions of this court."

One of the cases strongly relied upon by counsel for Mamo Clark is *Hartwell* v. *Tefft,* 19 R. I. 644. The decision

in that early Rhode Island case has not been, so far as I am able to ascertain, followed in any other jurisdiction. In *Smith* v. *Bradford*, 154 Atl. 272, 274, a later Rhode Island case, the court, referring to *Hartwell* v. *Tefft*, said that it was "often cited as an authority opposed to the rule applied in other cases that the testator's intention must govern" and "to that extent it must be considered no longer binding as an authority."

*Tirrell* v. *Bacon*, 3 Fed. 62, is given prominence, not only in the briefs of counsel for Mamo Clark, but in the opinion of my associates. That case is, however, clearly distinguishable from the one at bar. It involved a devise of the residue of the testator's estate in trust to pay the income to the testator's wife for life and upon her death to his children in equal shares and on the death of each child to convey his or her share of the property to his or her children. The testator died in 1857, leaving eight children. In 1879 one of the children, Edward, died leaving only an adopted child, the adoption having taken place in 1874. The limitations in the will after the death of the testator's wife were (1) "to his children" (2) "upon the decease of each child * * * to his or her child or children then living" and (3) "to the lawful issue then living of any deceased child of such child." In view of the fact that Edward, one of the testator's sons, died and left an adopted child, the question before the court was whether the adopted child was a child within the meaning of the second limitation. The court held that under an existing Massachusetts statute the adopted child was a child within the meaning of the will. The third limitation "to the lawful issue" was not involved so that the court was not called upon to determine whether the adopted child of Robert was "lawful issue" and in fact did not do so.

*Tirrell* v. *Bacon, supra,* involved the construction of a statute of Massachusetts then in force and is based

upon the authority of *Sewall* v. *Roberts,* 115 Mass. 262. The later Massachusetts case of *Blodgett* v. *Stowell,* 189 Mass. 142, repudiated the doctrine adopted in *Sewall* v. *Roberts.* *Blodgett* v. *Stowell, supra,* was cited with approval in *Gallagher* v. *Sullivan,* 251 Mass. 552; *Hutchins* v. *Browne,* 253 Mass. 55 and *In re Book's Will,* 105 Atl. (N. J.) 878, where the court, after pointing out that "the word 'issue' in a devise is equivalent to heirs of the body," then said: "Sewall v. Roberts * * * and those cases resting upon the broad language of the courts there used, are not persuasive in this state; the weight of authority in foreign jurisdictions where the statutes * * * have been identical with those at bar is in accord with my conclusion." *Wilder* v. *Wilder, supra,* is to the same effect, the court saying: "Tirrell v. Bacon rests on Sewall v. Roberts, and, together with that case, is not to be regarded as an authority in the case at bar."

The present case does not involve the question of the right of an adopted child to inherit from an intestate but it does involve the question of Mr. Cummins's intention with respect to those who are to ultimately share his trust estate. I can see nothing in his trust deed or in the circumstances surrounding its execution indicating an intention on his part to include within his bounty a child adopted by his daughter not only many years after the execution of his trust deed but in fact subsequent to his death.

Both upon reason and the entire weight of authority, it is my opinion that Mamo Clark is not entitled to participate in the distribution of the corpus of the trust estate of John A. Cummins and being further of the opinion that Flora Crowell is entitled to enjoy the annuity provided for her in the Cummins trust deed during her lifetime, the decree appealed from should be reversed.